UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at PIKEVILLE

CIVIL ACTION NO. 09-40-EBA

NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY,                                                           PLAINTIFF,

V.                    **MEMORANDUM OPINION AND ORDER**

RUTH JAMES, ET AL.,                                                          DEFENDANTS.

\*\*\* \*\*\* \*\*\* \*\*\*

This is a diversity case concerning an insurer's duty to defend its insured under a mobile homeowner's liability insurance policy. The matter is now before the Court on the parties' cross-motions for summary judgment. [Rs. 87, 89]. For the reasons discussed below, both motions will be denied to the extent they seek a declaratory judgment on Nationwide's duty to defend and indemnify the Defendants. Nationwide's motion will be granted as it relates to the obligation to provide coverage for biological cleanup expenses.

## I. FACTUAL BACKGROUND

The undisputed facts of this matter are as follows: On November 30, 2008 in Pike County, Kentucky, D.L.J., a minor child residing in the home of Harold and Ruth James, was in his bedroom with a number of friends. While in the bedroom, a rifle held by D.L.J. discharged, striking and killing one of his friends. No criminal charges have ever been filed against D.L.J.

On the date of the loss, Harold and Ruth James were the holders of a mobile homeowner's

insurance policy issued by Nationwide Mutual Fire Insurance Company.[1] D.L.J. was also an insured under the policy because he was a minor child residing in their home, and Ruth James had legal custody of D.L.J. Nationwide filed the instant diversity action seeking a declaration that the death of D.L.J.'s friend was an intentional loss and that Nationwide has no contractual obligation to defend and indemnify the Jameses should any claims arise from the shooting. The Jameses answered Nationwide's petition and counter-claimed, seeking: (1) reimbursement for up to $5,000 in expenses related to the clean-up of their mobile home following the tragic death, and (2) a declaration that the insurance policy covers any claims asserted against them and that Nationwide owes them a duty to defend should any claims be filed. Before the Court now are the parties' cross-motions for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Proc. 56(c). When "deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the non-moving party." B.F. Goodrich v. U.S. Filter Corp., 245 F.3d 587, 591 - 592 (6th Cir. 2001). In order "[t]o prevail, the non-movant must show sufficient evidence to create a genuine issue of material fact." Id. at 592. A factual issue "is 'genuine' if the evidence is such that a reasonable jury could return a verdict for

---

[1] The record indicates that Harold James died on January 25, 2009, prior to the initiation of this suit. The defendant parties to this action are Ruth James, individually and as Administratrix of Harold James' estate, and D.L.J. (hereinafter referred to collectively as the "Jameses").

the non-moving party." Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 451 (6th Cir.2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). This means that "the existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." Sutherland v. Mich. Dept. of Treasury, 344 F.3d 603, 613 (6th Cir. 2003) (citing Anderson, 477 U.S. at 251).

On cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Taft Broadcasting Co. v. U.S., 929 F.2d 240, 248 (6th Cir. 1991). Accordingly, the parties' motions will each be addressed separately on the claims for which they seek summary judgment.

### III. CLAIM & COUNTERCLAIM FOR DECLARATION OF RIGHTS

In their motions for summary judgment, both Nationwide and the Jameses seek an order defining their rights and obligations under the policy at issue. Nationwide seeks a declaration that it is not obligated to defend and indemnify the Jameses for any claims asserted against them as a result of the fatal shooting. The Jameses, conversely, seek a declaration that Nationwide is in fact obligated to defend and indemnify them for any claims arising out of the loss.

The liability policy at issue states that Nationwide "will pay damages the insured is legally obligated to pay due to bodily injury or property damage. We [Nationwide] will provide a defense at our expense by counsel of our choice." [R. 87-6 at 25]. This duty, however, is limited by several exclusions, including the one at issue here, which would exclude coverage for bodily injury or property damage "caused intentionally by or at the direction of an insured, including willful acts the

3

result of which the insured knows or ought to know will follow from the insured's conduct." [R. 87-6 at 14].

The interpretation of an insurance policy is a question of law. Bituminous Cas. Corp. v. Kenway Contracting, Inc., 240 S.W.3d 633, 638 (Ky. 2007). The "terms of insurance contracts have no technical meaning in law and are to be interpreted according to the usage of the average man and as they would be read and understood by him ... ." James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co., 814 S.W.2d 273, 280 (Ky. 1991). When interpreting an insurance contract, Kentucky law requires a court to apply two principles: "(1) the contract should be liberally construed and all doubts resolved in favor of the insureds; and (2) exceptions and exclusions should be strictly construed to make insurance effective." K.M.R. v. Foremost Ins. Group, 171 S.W.3d 751, 753 (Ky. App. 2005) (quoting Kentucky Farm Bureau Mutual Ins. Co. v. McKinney, 831 S.W.2d 164, 166 (Ky. 1992). A liberal interpretation, however, "is not synonymous with a strained one." K.M.R., 171 S.W.3d at 753. Clear and unambiguous terms in a contract must be construed using their "plain and ordinary meaning." Nationwide Mutual Ins. Co. v. Nolan, 10 S.W.3d 129, 131 - 132 (Ky. 1999).

The exclusion clause here is unambiguous and must be given its plain meaning. This exclusion clause provides a subjective standard for determining whether an insured's act is intentional. Coverage is excluded if "the insured knows or ought to know" the loss that occurred would follow from his acts. [R. 87-6 at 14]. Words indicating that subjective intent or awareness is the standard for evaluating the applicability of an exclusionary clause requires the facts to be viewed from the point of view of the insured. Brown Found., 814 S.W.2d at 279. As a result, Nationwide will be relieved of its duty to defend and indemnify if D.L.J. subjectively knew, or ought

4

to have known, that his actions leading up to the discharge of the rifle would result in his friend's death. Because a factual dispute exists regarding D.L.J.'s subjective intent, the Court finds that both motions should be denied.

**A. Nationwide's Motion for Summary Judgment**

When the subjective standard is used, the insured must have expected or intended the loss that occurred in order for the exclusion to apply, otherwise the insurance company is obligated to provide a defense. Brown Found., 814 S.W.2d at 277. The central fact issue in this claim, therefore, is D.L.J.'s subjective intent, and "[w]hether an insured intended the consequences of its action is normally a question of fact and not one of law." Id. at 276. Under Kentucky law, however, a trial judge "is not absolutely prohibited from inferring on summary judgment that an insured intended or expected damage regardless of whether the objective or subjective test is used." Id. at 277. Under this doctrine, "certain actions by the insured give rise to an 'inferred intent,' regardless of the actor's actual intent, so as to preclude coverage." Nationwide Mutual Fire Ins. Co. v. Pelgen, 241 S.W.3d 814, 814 (Ky. App. 2007). Kentucky courts apply this doctrine when the act giving rise to the loss "is so inherently injurious, or substantially certain to result in some injury, that the intent to injure, or the expectation that injury will result, can be inferred as a matter of law." Thompson v. West American Ins. Co., 839 S.W.2d 579, 581 (Ky. App. 1992).

The case before the Court is not one where subjective intent to cause injury may be inferred from the very nature of the act. Nationwide argues that because D.L.J. pointed the rifle at the decedent, toggled the safety to a firing position, and had a reason to believe the rifle was loaded, [R. 62 at 22 - 25] this Court should infer, as a matter of law, that D.L.J. intended or expected the decedent to be shot. As proof of D.L.J.'s intent, Nationwide offers the deposition testimony of two

5

eyewitnesses. SM, a minor present during the shooting, testified that just prior to the discharge, D.L.J. asked the decedent "What would you do if I shot you?" [R. 60 at 10, 16]. JD, another minor present during the shooting, testified that D.L.J. may have asked the decedent "what would happen if it went off" or something similar. [R. 61 at 15]. This evidence, if admissible, might support a finding by the jury that D.L.J. either intended to shoot the decedent or expected that he would be shot.

The facts asserted by the Jameses, however, lead the Court to conclude that questions concerning D.L.J.'s subjective intent remain. First, D.L.J. testified that he did not touch the trigger when the rifle discharged and that the discharge was accidental. [R. 62 at 20]. Furthermore, a forensic scientist with the Kentucky State Police Eastern Regional Crime Lab examined the rifle involved in the shooting and found it to be defective. [R. 77]. In fact, the investigator found that the rifle could fire without touching the trigger when the safety mechanism was switched from a safe to firing position. [Id. at 11 - 13]. The Jameses' version of events show that on the night of the fatal shooting, D.L.J. took the rifle off the wall, aimed it away from any individuals present and pulled the trigger a number of times while the safety was fully engaged. The rifle did not discharge at this time. Later in the evening, without checking to see if it was loaded, D.L.J. pointed the rifle at the decedent's head. He switched the safety out of the full-safe position, and due to a defect with the weapon, it discharged without D.L.J. touching the trigger. [R. 62 at 33 - 34].[2] This evidence, viewed

---

[2] Q: In other words, had you---up to this point, had you pulled the trigger any before that to see if the safety was on?
D.L.J.: Yeah, I made sure the safety was on.
Q: Okay. So, you…
D.L.J.: I had it pointed at the bed, and I pulled, and nothing happened, and I pulled---and I pulled the trigger while it was pointing a the bed.

6

in a light most favorable to the Jameses, tends to suggest that the discharge of the firearm was accidental and that D.L.J. did not intend or expect the decedent to be harmed.

The present case is easily distinguished from the Kentucky cases holding that intent to cause harm can be inferred as a matter of law. In Thompson v. West American Ins. Co., the issue was whether an insurance policy held by Thompson required his insurer to defend and indemnify him in an underlying civil action filed against him for alleged acts of sexual molestation. Thompson, 839 S.W.2d at 580. The insurance company moved for summary judgment, but Thompson argued that because the insurance company could not prove that Thompson actually intended the resulting injuries to his victims, he should prevail. The Court of Appeals disagreed, holding that "sexual molestation is so inherently injurious, or substantially certain to result in some injury, that the intent to injure, or the expectation that injury will result, can be inferred as a matter of law." Id. at 581. The court explained that the "emotional and psychological harm caused by sexual molestation is so well recognized, and so repugnant to public policy and to our sense of decency, that to give merit to a claim that no harm was intended to result from the act would be utterly absurd." Id.

Another court dealt with the situation where an insured walked up to another vehicle and punched the driver in the face. Walker v. Economy Preferred Ins. Co., 909 S.W.2d 343, 344 (Ky.

---

    Q: Okay.
    D.L.J.: And nothing happened.
    Q: And the safety was on then?
    D.L.J.: Yeah.
    Q: So, pointing down at the bed, you pulled the trigger how many times?
    D.L.J.: Two (2) or three (3) times to make sure it wasn't…
    Q: That the safety was on?
    D.L.J.: Yes.
    Q: All right. So, when you pointed it at D's head, you flipped the safety off into a firing position?
    D.L.J.: Yeah, but my finger was off the trigger then, I'm pretty sure.

App. 1995). The policy owned by the insured stated that personal liability coverage did not apply to bodily injury "which is expected, anticipated, foreseeable or intended by the insured." Id. The insurer moved for summary judgment, and the insured argued that he did not subjectively intend to injure the victim of the punch. Id. In affirming the grant of summary judgment, the court held "that the 'inherently injurious' act of punching someone in the face supports the trial judge's inference as a matter of law that" the insured intended to injure the victim. Id. at 345.

The Court of Appeals has also inferred intent as a matter of law when the insured is actually convicted of a crime that required a finding of intent. Parsley v. Kentucky Farm Bureau Mut. Ins. Co., 32 S.W.3d 103, 106 (Ky. App. 2000). Such a conviction will preclude re-litigation of the issue of the insured's subjective intent. Id. In the present case, the Defendants assert, and Nationwide does not deny, that D.L.J. has never been convicted or charged with a crime for his role in the fatal shooting.

Kentucky courts have also found intent as a matter of law in cases involving firearms. These cases too, are distinguishable. In Stone v. Kentucky Farm Bureau Mut. Ins. Co., the insured pointed a rifle directly at his infant son and shot him at close range. The insured then took his own life. Stone v. Kentucky Farm Bureau Mut. Ins. Co., 34 S.W.3d 809, 812 (Ky. App. 2000). The insurance company filed suit seeking a declaration of rights concerning a homeowner's policy held by the insured. In affirming the insurance company's grant of summary judgment, the court, citing Walker, held that "[i]f a trial judge may infer intent to harm from the act of punching someone in the face, then *a fortiori*, a trial judge may infer intent to harm from the act of pointing and shooting a rifle at an infant at close range." Id. at 813. When the facts are clear that a shooting is intentional, a court may infer intent to harm. Kentucky Farm Bureau Mut. Ins. Co. v. Coyle, 285 S.W.3d 299, 306 (Ky.

8

App. 2008) (finding inferred intent where the insured "admitted that he intentionally and deliberately discharged a bullet" at the victim); Nationwide Mut. Fire Ins. Co. v. Pelgen, 241 S.W. 3d 814, 818 (Ky. App. 2007) (finding inferred intent where the insured "deliberately pointed a gun at his wife's face, pulled the trigger, and then took the same gun and shot himself.").

Kentucky courts have not inferred intent to harm in any case with facts substantially similar to the ones asserted here. Viewing the facts of this case in a light most favorable to the Jameses, and making all reasonable inferences in their favor, a reasonable jury could conclude the shooting was accidental and that D.L.J. lacked the requisite intent. B.F. Goodrich, 245 F.3d at 591 - 592. The presence of accident was not even a remote possibility in any of the firearm related cases cited above. Accordingly, because questions of material fact remain, namely what D.L.J. subjectively intended or expected to happen, Nationwide's motion is denied with respect to its claim for a declaration of rights under the insurance policy.

**B. The Defendants' Motion for Summary Judgment**

The Defendants' motion for summary judgment on the claim that Nationwide owes them a duty to defend and indemnify will also be denied. Viewing the facts in a light most favorable to the non-moving party, Nationwide, the Court concludes that genuine issues of material fact remain. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The Jameses assert that a reasonable jury could not conclude that D.L.J. subjectively intended or expected the decedent's death. In support of this contention, they direct the Court's attention to testimony establishing that D.L.J. did not know the rifle was loaded, did not touch the trigger of the rifle, and that the rifle was defective. According to the Jameses, these facts leave no doubt that the death of D.L.J.'s friend was unintentional within the meaning of the insurance policy.

9

Nationwide, however, has satisfied its burden by presenting enough evidence of D.L.J.'s intent so that a reasonable jury could find in its favor. As evidence that D.L.J. subjectively knew the shooting death would be the result of his actions, Nationwide first offers evidence that D.L.J. was an experienced hunter and was familiar with firearms. D.L.J. testified that he owned several guns, hunted with firearms since about age seven, and possessed a Hunter's Safety Card. [R. 62 at 8 - 10]. This evidence suggests that D.L.J.'s extensive experience with firearms means he ought to have known that his unsafe handling of the rifle would result in death or serious injury to the decedent. The deposition testimony of two eyewitnesses also suggest that the shooting may have been intentional. SM, a minor present during the shooting, testified that just prior to the discharge, D.L.J. asked the decedent "What would you do if I shot you?" [R. 60 at 10, 16]. JD, another minor present during the shooting, testified that D.L.J. may have asked the decedent "what would happen if it went off" or something similar. [R. 61 at 15]. This evidence, when viewed in a light most favorable to Nationwide, suggests that D.L.J. either intended to shoot the decedent or expected that he would be shot.

Both sides have presented conflicting evidence on the issue of intent, and because "[w]hether an insured intended the consequences of its action is normally a question of fact", the Jameses' motion is denied with respect to their claim for a declaration that insurance coverage exists and that Nationwide owes them a duty to defend any claims asserted against them. Brown Found., 814 S.W.2d at 276.

## IV. COUNTERCLAIM FOR REIMBURSEMENT OF BIOLOGICAL CLEAN UP EXPENSES

The parties also move for summary judgment on the Jameses' claim that Nationwide must reimburse them for costs incurred in cleaning their mobile home after the fatal shooting. Nationwide

10

contracted to pay such costs "[i]n the event that a covered loss results in biological deterioration or damage to" covered property. Nationwide's obligation under this clause, however, is limited to covered losses. [R. 87-6 at 8]. Covered losses do not include "[i]ntentional or criminal acts, meaning loss resulting from an act committed by or at the direction of an insured that may reasonably be expected to result from such acts; or is the intended result from such acts." [R. 87-6 at 6].

Interpretation of this coverage exclusion is a question of law. <u>Bituminous Cas. Corp.</u>, 240 S.W.3d at 638. Because the language of the exclusion is unambiguous, it must be interpreted according to its "plain and ordinary meaning." <u>Nolan</u>, 10 S.W.3d at 131. The first part of the exclusion requires either an intentional or criminal act. An act is intentional if willfully or volitionally performed. In this case, it is undisputed that D.L.J. willfully aimed a rifle at the decedent's head and switched the safety to a firing position. The second part of the exclusion requires the loss that occurs to be either reasonably expected or intended. As discussed in detail above, a question of fact remains with regard to whether D.L.J. actually intended the harm that occurred. Accordingly, the focus of the Court's inquiry here is whether the harm was reasonably expected.

Although no Kentucky court has interpreted an exclusionary clause similar to the one at issue here, the weight of authority suggests that, in applying the "may reasonably be expected" language, an objective standard should be used and that the insured's subjective intent is irrelevant. <u>See</u> <u>Continental Ins. Co. v. Adams</u>, 438 F.3d 538, 543 - 544 (6th Cir. 2005) (Clay, J., *concurring*).

> ... [T]he intentional act exclusion in this case also states that Plaintiff is not responsible for 'bodily injury or property damage [ ][i]ntended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions' of the insured. Although no Kentucky court to date has interpreted similar language,

11

> courts addressing similar language in other states have held that the phrase "which may reasonably be expected to result" denotes an objective as opposed to subjective standard of coverage rendering the insured's intent to cause damage irrelevant.

Id. A plain reading of the clause also supports this interpretation. The exclusion clause at issue here is disjunctive. Coverage is excluded for losses that are either reasonably expected *or* intended. The second part clearly requires a subjective intent by the insured to inflict harm. Injecting a subjective intent requirement into the "may reasonably be expected" language would render the intent portion of the exclusionary clause entirely superfluous. Allstate Ins. Co. v. Brown, 16 F.3d 222, 225 (7th Cir. 1994) (applying Indiana law). Such an interpretation would violate the Kentucky rule that a contract should be interpreted to give effect to all of its parts. City of Louisa v. Newland, 705 S.W.2d 916, 919 (Ky. 1986). The "may reasonably be expected to result" language, therefore, should be read to provide an objective standard for determining whether certain losses are excluded from coverage.

Decisions from other jurisdictions support this interpretation. The Supreme Court of Michigan, for example, has interpreted an intentional acts exclusion similar to the one at issue here and concluded it establishes an objective standard. Allstate Ins. Co. v. Freeman, 443 N.W.2d 734 (Mich. 1989). The exclusion clause at issue in that case stated that the insurance company would "not cover any bodily injury or property damage which *may reasonably be expected* to result from the intentional or criminal acts of an insured person or which is in fact intended by an insured person." Id. at 748 (emphasis in original). Interpreting this language, the court held that under that particular clause, an insurer relieves itself of the duty to defend and indemnify if "(1) the insured acted either intentionally or criminally, and (2) the resulting injuries occurred as the natural, foreseeable, expected, and anticipated result of an insured's intentional or criminal acts." Id. at 756;

12

see also Allstate Ins. Co. v. McCarn, 683 N.W.2d 656, 659-60 (Mich. 2004). Michigan is not alone in applying an objective standard to exclusionary clauses similar to the one at issue here. The Seventh Circuit has addressed an insurance policy that excluded coverage for personal injury that "may reasonably be expected to result from the intentional or criminal acts of an insured person or which is in fact intended by an insured person." Brown, 16 F.3d at 224. Applying Indiana law, the court held that the exclusion clause precluded coverage for "injuries that were the probable, direct and foreseeable consequence" of the insured's intentional acts. Id. at 226. Many other courts have similarly found such an exclusion to be unambiguous and to provide an objective standard. See e.g. Allstate Ins. Co. v. Burrough, 120 F.3d 834, 841 (8th Cir. 1997) (no coverage for "bodily injury or property damage intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of, any insured person."); Scott v. Allstate Indem. Co., 417 F.Supp.2d 929, 935-36 (N.D. Ohio 2006) (excluding coverage for intentional or criminal acts if the loss that occurs "may be reasonably expected to result from such acts; or is the intended result of such acts."); Allstate Ins. Co. v. Myers, 951 F.Supp. 1014, 1018 (M.D. Fla. 1996) (exclusion similar to Burrough); Allstate Ins. Co v. Foster, 693 F.Supp.886, 888 (D.Nev. 1988) (no coverage for "bodily injury or property damage which may reasonably be expected to result from the intentional or criminal acts of an insured person."); Tripp v. Allstate Ins. Co., 584 S.E.2d 692, 695 (Ga. App. 2003) (no coverage for injury which may reasonably be expected to result from the intentional acts of the insured which are crimes pursuant to the Georgia Criminal Code); Erie Ins. Exch. v. St. Stephen's Episcopal Church, 570 S.E.2d 763, 766-67 (N.C. App. 2002) (coverage excluded for bodily injury or property damage "which is intended by or which may reasonably be expected to result from the intentional acts or omissions or criminal acts or omissions of one ore more insured

persons."); Allstate Ins. Co. v. Simansky, 738 A.2d 231, 233 (Conn. Super. Ct. 1998) (same exclusion as in Brown).

The weight of authority and a plain reading of the exclusionary clause convince the Court that an objective standard should be applied here. The facts of this case have already been laid out in detail. It is undisputed that D.L.J. intentionally pointed the rifle at the decedent's head and intentionally switched the safety to a firing position while the gun was still aimed at the victim's head. These facts are supported by D.L.J.'s own testimony:

> I was playing around with it [the rifle], and I wasn't meaning to hurt anybody or anything like that, and I pointed it---I started pointing it at him, and I was just playing around. I didn't have my finger on the trigger or anything. And we was just sitting there playing; and, the next thing I know, I flipped the safety a couple of times, and it went off.

[R. 62 at 20]. Based upon these facts, the issue before the Court is whether death or serious injury was the "probable, direct and foreseeable consequence" of D.L.J.'s actions. Brown, 16 F.3d at 224.

In Kentucky, "the pointing of a gun, whether loaded or unloaded (provided there is reason to believe the gun may be loaded) at any person constitutes conduct that 'creates a substantial danger of death or serious physical injury to another person' in violation of KRS 508.060." Key v. Commonwealth, 840 S.W.2d 827, 829 (Ky. App. 1992) (quoting Ky. Rev. Stat. § 508.060(1)). Under Ky. Rev. Stat. § 508.060(1), the pointing of a gun at another person, with reason to believe the gun is loaded, constitutes conduct that is wanton. Id. It is undisputed that D.L.J. intentionally aimed the rifle at the victim and moved the safety into a firing position. Nationwide also alleges that D.L.J. had reason to believe the gun was loaded. As evidence that D.L.J. knew or had reason to believe the rifle was loaded, Nationwide relies on the deposition testimony of D.L.J. and two other minors present at the time of the shooting. First, Nationwide asserts that because D.L.J. had gone

14

deer hunting with the same rifle a few days prior to the fatal shooting, he had reason to know it was loaded. [See R. 62 at 21]. Second, SM, a minor present during the shooting, testified that D.L.J. had removed four shells from the rifle, then placed them back in the rifle just prior to the shooting. According to this witness, D.L.J. "stuck one shell in the chamber and the other three (3) in the gun." [R. 60 at 14]. Additionally, JD, another minor present during the shooting, testified that D.L.J. looked into the chamber of the rifle prior to the shooting. [R. 61 at 15 - 16]. Finally, the Kentucky State Police detectives who investigated the shooting testified that, based upon their investigation and interviews with D.L.J. and the witnesses, D.L.J. knew the rifle was loaded. [R. 64 at 36, R. 65 at 11 - 12].

The Jameses dispute that D.L.J. had reason to believe the rifle was loaded. As evidence that D.L.J. had no reason to believe the rifle was loaded, they offer his own testimony that he did not check to see if it was loaded prior to the discharge. [R. 62 at 22].[3] Even if a jury were to believe that D.L.J. did not check the gun to see if it was loaded, this does not create a genuine issue with respect to whether D.L.J. had reason to believe it was loaded. Simply failing to inspect whether a gun is in fact loaded does not necessarily establish that there is no reason to believe it is loaded. Nationwide has presented evidence that D.L.J. had reason to believe the gun was loaded when he

---

[3] Q: Okay. And you took the gun off the rack. Did you check it in any way to see if it was loaded?
D.L.J.: No, Sir.
Q: Why not?
D.L.J.: I forgot. I didn't think about it.
Q: Okay. So, you don't think you at any time wrenched the bolt back on the gun?
D.L.J.: Not all---no, not all the way back.
Q: Okay. Did you wrench it back partway?
D.L.J.: No. I may have sit there and fumbled with the bolt, but that's more less all I could do.

pointed it at the decedent. The Jameses have only presented evidence that he did not check to see if it was loaded.

D.L.J. violated Ky. Rev. Stat. § 508.060 by intentionally pointing a rifle at the victim's head with reason to believe the rifle was loaded.[4] Accordingly, his conduct was wanton. Key, 840 S.W.2d at 829; Ky. Rev. Stat. § 508.060(1). The probable, direct and foreseeable consequence of wanton conduct involving a dangerous instrumentality like a firearm is undoubtedly death or serious injury. Because no question of material fact remains with respect to whether the death of D.L.J's friend was the reasonably expected result of D.L.J's conduct, summary judgment will be granted in favor of Nationwide on the claim for reimbursement of cleanup expenses.

## V. CONCLUSION

For the reasons discussed, and because issues of material fact remain, IT IS HEREBY ORDERED that both parties' motions for summary judgment [Rs. 87, 89] are DENIED to the extent they seek a declaratory judgment. Nationwide's motion, [R. 87] however, is GRANTED to the extent it requests summary judgment on the issue of reimbursement for biological cleanup expenses under the liability policy. Accordingly, the Defendants' counterclaim for reimbursement of cleanup expenses up to $5,000 is DISMISSED.

Signed February 3, 2011.



Signed By:
*Edward B. Atkins*  *EBA*
United States Magistrate Judge

---

[4] The Court's finding that D.L.J. violated Ky. Rev. Stat. § 508.060 does not impact the outcome of the declaratory judgment action. The exclusionary clause at issue in that claim requires a subjective intent to cause the harm that occurred. Ky. Rev. Stat. § 508.060 is not a specific intent statute.